Kelly v. Metro. Life Ins. Co., 2022 NCBC 70.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

JOHN "KRIS" KELLY,

Plaintiff,

v.

METROPOLITAN LIFE
INSURANCE COMPANY; MSI
FINANCIAL SERVICES, INC. f/k/a
METLIFE SECURITIES, INC.; and
JOHN D. PHILLIPS,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
2018 CVS 4978

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
[Public][1]**

1. **THIS MATTER** is before the Court on Defendants Metropolitan Life Insurance Company ("MLIC") and MSI Financial Services, Inc.'s ("MSI Financial") (together, "MetLife") Motion for Summary Judgement (the "Motion") filed 22 December 2021. (ECF No. 149 [the "Mot."].)[2] Pursuant to Rule 56 of the North

---

[1] Recognizing that this Order and Opinion cites to and discusses the subject matter of documents that the Court has allowed to remain under seal in this action, and out of an abundance of caution, the Court filed this Order and Opinion under seal on 2 November 2022. (*See* ECF No. 194.) On 11 November 2022, the parties notified the Court that, after conferring, all parties agree there is no material in this Order and Opinion that requires sealing. Accordingly, the Court now files this public version of this Order and Opinion.

[2] Defendant John D. Phillips ("Phillips") is not a party to the Motion. On 4 December 2020, Phillips filed a petition under Chapter 13 in the United States Bankruptcy Court for the Western District of North Carolina. (Stay Order 1–2, ECF No. 133 [the "Stay Order"].) The Court, following notice from Phillips' counsel, entered the Stay Order only as to Phillips on 22 December 2020. (Stay Order 3.) Absent unusual circumstances, an automatic stay under 11 U.S.C. § 362 only protects the debtor, not co-defendants. *See In re Robert F. Youngblood Constr. Co.*, 2012 Bankr. LEXIS 1214, at *4 (Bankr. E.D.N.C. March 22, 2012). The Court provided all parties, including MetLife, with the opportunity to file a motion seeking protection on the basis of the automatic stay, but no such motion was filed with the Court. As a result, the action proceeded as to all other parties. The Stay Order is effective as to

Carolina Rules of Civil Procedure (the "Rule(s)"), MetLife requests this Court grant the Motion as to all remaining claims asserted by Kelly because there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. (Mot. 1.)

2. For the reasons set forth herein, the Court **GRANTS** the Motion.

*Hemmings & Stevens, PLLC by Aaron C. Hemmings and Kelly A. Stevens, for Plaintiff.*

*Parker Poe Adams & Bernstein LLP by Charles E. Raynal IV, Stephen V. Carey, William L. Esser, and Katie M. Iams, and Morgan, Lewis & Bockius, LLP by John A. Vassallo, pro hac vice, and Thomas Peter R. Pound, pro hac vice, for Defendants MSI Financial Services, Inc. and Metropolitan Life Insurance Company.*

*Mullins Duncan Harrell & Russell PLLC by Leslie C. Harrell and Tyler Nullmeyer, for Defendant John Phillips.*

Robinson, Judge.

## I. INTRODUCTION

3. This case arose out of an alleged Ponzi scheme operated by Charlotte, North Carolina businessman Richard C. Siskey ("Siskey") for a number of years prior to his death on 28 December 2016. Siskey was, for a period of time, a MetLife employee who worked as a financial and investment advisor, securities broker, and insurance salesman in MetLife's Charlotte, North Carolina office. Plaintiff John K. Kelly ("Kelly") engaged Siskey as a securities broker, investment advisor, and/or insurance agent. Kelly also engaged Defendant John Phillips ("Phillips") in similar roles. Kelly's claims against MetLife arise out of Siskey and Phillips' conduct.

---

Phillips unless and until the Bankruptcy Court grants relief or otherwise disposes of the bankruptcy proceeding. (Stay Order 2.)

## II.    FACTUAL BACKGROUND

4.    The Court does not make findings of fact when ruling on motions for summary judgment.  "[T]o provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication."  *Ehmann v. Medflow, Inc.*, 2017 NCBC 86, ¶ 22 (N.C. Super. Ct. Sept. 26, 2017).

### A.    <u>The Parties</u>

5.    Kelly is a resident and citizen of Summerfield, Guilford County, North Carolina.  (First Am. Compl. ¶ 2, ECF No. 48 ["Am. Compl."].)

6.    Defendant MLIC is a corporation organized under the laws of New York, with its principal place of business located in New York, New York.  (Am. Compl. ¶ 7.) MLIC has an office located in Mecklenburg County, North Carolina, and it is authorized to do business in North Carolina as an issuer of life insurance policies and other financial services products.  (Am. Compl. ¶ 7.)

7.    Defendant MSI Financial is a corporation organized under the laws of Delaware, with its principal place of business in Springfield, Massachusetts.  (Am. Compl. ¶ 8.)  MSI Financial has an office in Mecklenburg County, North Carolina. (Am. Compl. ¶ 8.)  MSI Financial is a subsidiary of MLIC engaged in the sale of securities.  (Am. Compl. ¶ 8.)

### B.    <u>MetLife's Connection to Phillips and Siskey</u>

8.    Phillips began working for MetLife on 25 October 1999.  (Aff. John D. Phillips ¶ 1, ECF No. 148.6 ["Phillips Aff."].)  After fourteen years, on 30 December 2013, Phillips became an independent contractor permitted to sell authorized MetLife

securities and investment products. (Phillips Aff. ¶¶ 2–3.) Phillips terminated his relationship with MetLife on 31 October 2015 but retained authority to service pre-existing insurance-related business. (Phillips Aff. ¶ 4.) As of 1 November 2015, Phillips had been subject to no disciplinary action or investigation while working at MetLife. (Aff. Gregory S. Williams ¶ 13, ECF No. 148.1 ["Williams Aff."].)

9. Siskey began working for MetLife in November 1999. (Williams Aff. ¶ 14.)

10. In 2004, while an employee of MetLife, Siskey signed a consent with the National Association of Securities Dealers (the "NASD")[3] agreeing to accept a fine and suspension of his license to sell securities for two years as a result of failing to provide "sufficient prior written notice" of participation in "private securities transactions." (ECF Nos. 148.10, 148.11.) Following the period of license suspension—20 September 2004 to 19 September 2006—Siskey never regained his securities license. (Williams Aff. ¶ 15; ECF No. 148.11.) Because Siskey did not have a license to sell securities, he had no employment or other contractual relationship with MSI Financial after 20 September 2004. (Williams Aff. ¶ 15.)

11. MetLife filed a Form U5, and the NASD filed a Form U6, each containing information about Siskey's deregistration and the 2004 disciplinary action. (Williams Aff. ¶ 16.)

12. Siskey remained an MLIC employee until 1 April 2011. (Williams Aff. Ex. G.) On 4 April 2011, Siskey became an independent contractor for MLIC.

---

[3] The NASD was the predecessor to what is now known as FINRA, the Financial Industry Regulatory Authority, a government-authorized organization which oversees United States broker-dealers.

(Williams Aff. Ex. H, 1 ["Independent Contractor Agreement"].) As an independent contractor, Siskey was contractually required to keep "outside business 'entirely independent' from his activities as a MetLife insurance broker," and he agreed to stop using the name "Wall Street Capitol" in his business activities. (Williams Aff. ¶ 19 (quoting Williams Aff. Ex. I).) On 13 December 2013, Siskey entered into an Affiliated Broker Contract with MLIC whereby Siskey remained an independent contractor for MLIC. (Williams Aff. ¶ 20; *see* Williams Aff. Ex. J.)

13. Siskey terminated his contract in November 2015 prior to being interviewed as part of an internal investigation concerning up to seventeen life insurance policies Siskey purchased on the lives of fourteen of his individual business clients. (Dep. Anthony E. Bundy 64:8–65:6, ECF No. 186.1 ["Bundy Dep."]; Bundy Dep. Exs. Ex. 1006, 2, ECF No. 186.2 ["Bundy Dep. Exs."].)

14. While performing in various capacities for MetLife, Siskey and Phillips worked together in the Wall Street Capitol office located at Suite 400, 4521 Sharon Road, Charlotte, North Carolina. (*See* ECF No. 148.5 ["WSC DBA"].) Siskey and Phillips, along with other MetLife brokers and employees, worked in Suite 400 using the trade name "Wall Street Capitol" for MetLife business. (WSC DBA 8–9.) The sign on the office door for Suite 400 read, "Wall Street Capitol an office of MetLife." (Bundy Dep. Exs. Ex. 1010.) This practice continued until 29 June 2016, when the Wall Street Capitol name was re-registered to five individuals, excluding Siskey and Phillips. (WSC DBA 1–2.)

15. Although Wall Street Capitol was a name associated with MetLife, MetLife contends that emails from domains such as "wallstreetcapitol.com" and "wscap.com" are not associated with MetLife and that MetLife did not have access to, or possession of, emails sent to or from those domains. (Williams Aff. ¶ 32.)

### C. Kelly's Relationship with Siskey and Phillips

16. Kelly first met Phillips in the spring of 2015 at a lunch at the Grandover Resort in Greensboro, North Carolina. (Phillips Aff. ¶ 5; Dep. of John Kelly 36:20–36:24, 37:24–38:1, ECF No. 168 ["Kelly Dep."].) During his deposition, Kelly recalled that Phillips was a financial advisor, but he did not recall details of their conversation or what investments were discussed at the meeting. (Kelly Dep. 39:2–39:25.) Phillips recollected that they did not discuss MetLife products but instead discussed Kelly's interest in investing in Siskey's companies. (Phillips Aff. ¶¶ 6–7.) During that meeting, Phillips recalled that Kelly specifically expressed interest in investing in TSI Holdings, LLC ("TSI") and Siskey Capital, LLC. (Phillips Aff. ¶ 8.)

17. After their first meeting, Kelly and Phillips met at least six times between 2015 and the end of 2016. (Kelly Dep. 43:12–43:15.) At least four or five of those meetings occurred at the Wall Street Capitol office in Charlotte. (Kelly Dep. 44:12–44:25.)

18. Kelly met Siskey in person on one occasion, in the reception area of the 4521 Sharon Road building, where they discussed investments. (Kelly Dep. 48:25–49:19, 50:12–50:18.) That is the only time Kelly recalls meeting Siskey in person, one on one, to discuss investments. (Kelly Dep. 52:25–53:2.) Kelly also interacted with

Siskey when they attended investment-related meetings, including one for Level Beauty, Inc., and another for an insurance company. (Kelly Dep. 53:18–54:1.) Phillips also attended those meetings. (Kelly Dep. 55:6–55:16.)

19.  Kelly interacted with Siskey socially when Kelly attended an event at Siskey's home and the two discussed Siskey's Corvettes. (Kelly Dep. 47:13–48:18.)

### D.  Kelly's Investments in Siskey-Related Entities

20.  Kelly initially invested in TSI Holdings, LLC ("TSI Holdings") and Stone Street Partners, LLC ("Stone Street")[4] in June 2015. (Phillips Aff. ¶ 10.) Kelly invested additional funds in TSI in July 2015, and in Stone Street in both July 2015 and September 2015. (Phillips Aff. ¶ 12.) Neither TSI Holdings nor Stone Street was a MetLife branded security, or an investment offered by MetLife; they were not invested through a MetLife account; and they were not held at MetLife. (Phillips Aff. ¶¶ 13, 15.)

21.  Between June 2015 and July 2016, Kelly also invested in Level Beauty, Inc. ("Level Beauty"), Kure Corp. ("Kure"), and Sharon Road Properties, LLC ("Sharon Road Properties"). These investments were not MetLife branded securities or investments offered by MetLife, and they were not held at MetLife or invested through a MetLife account. (Phillips Aff. ¶¶ 18–19, 23.)

22.  Kelly represented that he was a qualified and sophisticated investor, (*see, e.g.*, Kelly Dep. 86:1–86:5; 117:11–117:16), and that he understood the risk involved with the investments, (*see, e.g.,* Kelly Dep. 198:17–198:22).

---

[4] After Siskey died, Siskey Capital changed its name to Stone Street, LLC. (*See* Kelly Dep. 146:23–146:25.) The Court herein refers to the entity as Stone Street.

23. Kelly's investments in the above entities totaled approximately $885,227.

24. Kelly testified at his deposition that MetLife knew Siskey was "stealing from his customers" and had MetLife intervened, Kelly would never have invested. (Kelly Dep. 283:7–283:21.)

25. Kelly never received a statement of account or other documentation of his investments from MLIC, MSI Financial, or any entity that was identified with MetLife. (Kelly Dep. 311:19–312:12.) Kelly is also not on record with MetLife as having ever been a customer of MLIC, MSI Financial, or the MetLife organization more broadly. (Williams Aff. ¶ 26.) MetLife has no record of an insurance product, brokerage account, or any other account held in Kelly's name. (Williams Aff. ¶ 27.) MetLife has no record of correspondence with Kelly, insurance applications in connection with Kelly, account opening materials associated with Kelly, or information that would otherwise identify Kelly to MetLife. (Williams Aff. ¶¶ 28–31.)

### i. TSI Holdings

26. On 23 June 2015, Kelly invested $100,000 in TSI Holdings. (Kelly Dep. 171:13–171:22, 175:17–175:24.) At the time he invested, Kelly understood that TSI Holdings was an investment holding company. (Kelly Dep. 171:23–172:4.) Kelly and Phillips met at the Grandover Resort prior to the investment, where Phillips informed Kelly that TSI Holdings was related to Stone Street. (Kelly Dep. 172:5–172:24, 173:24–174:3.) Phillips also told Kelly that the investment was "guaranteed" for a

5% return in year one, a 5.5% return in year two, and a 6% return in year three with a maturity date of 2018. (Kelly Dep. 175:25–176:9, 183:13–183:24.)

27. On 20 November 2015, Kelly again invested in TSI Holdings. (Kelly Dep. 224:18–225:6.) In total, Kelly invested approximately $305,227 in TSI Holdings. (ECF No. 148.37.)

### ii. Stone Street

28. Kelly invested $200,000 in Stone Street on 23 June 2015. (Kelly Dep. 109:14–110:1.) Prior to investing, he discussed the investment in person with Phillips. (Kelly Dep. 104:10–105:1.) Phillips represented to Kelly that the average return on investments in Stone Street was anywhere from thirty to thirty-two percent. (Kelly Dep. 209:14–209:21.) On the offering memorandum, the investment is described as involving "a high degree of risk" and "speculative." (Kelly Dep. 114:20–115:9.) Kelly was certain at his deposition that he looked over the offering memorandum when he received it, but he went forward with the investment because Phillips and Siskey "were running an operation involving MetLife, [and] that there wouldn't be any fraud." (Kelly Dep. 115:16–116:7.) Kelly's position is that Stone Street was the same as MetLife because Wall Street Capitol was registered as an office of MetLife and because of Siskey's relationship with MetLife. (Kelly Dep. 121:21–122:16, 126:21–127:8.)

29. Prior to investing in Stone Street, Kelly received an investment packet containing information about the entity and its Management. (*See* Siskey Capital Investment Packet, ECF No. 148.18 ["Stone St. Inv. Packet"].) Siskey is listed in the

packet as a principal of the Company, and the packet clearly discloses that he "has been the subject of various legal and administrative proceedings, none of which are (sic) considered to be material to the operation of the Company. Further information about any of these matters will be provided upon request." (Stone St. Inv. Packet 22.)

30. Kelly invested an additional $130,000 in Stone Street on 28 July 2015. (Kelly Dep. 144:7–144:18.) In total, Kelly invested about $330,000 in Stone Street. (Kelly Dep. 103:23–104:1, 144:15–144:18.)

### iii. Level Beauty

31. Kelly invested a total of $75,000 in Level Beauty.[5] (Kelly Dep. 65:23–66:3.) Kelly invested in Level Beauty after a meeting attended by Siskey and a conversation with Phillips. (Kelly Dep. 59:20–60:19.) Kelly could not identify any false statements made to him about the Level Beauty investment. (Kelly Dep. 61:20–63:1, 75:9–76:4.)[6] As of the hearing on the Motion on 9 September 2022 (the "Hearing"), Kelly still owned the Level Beauty stock. (*See* Kelly Dep. 63:6–63:9.)

### iv. Kure

32. Kelly invested $75,000 in Kure on 19 September 2015. (164:11–164:17.) Before deciding to invest in Kure, Kelly spoke with Phillips regarding the brand and the products it would be offering. (Kelly Dep. 157:3–157:12.) Kelly was influenced by Phillips' excitement regarding the company's plans for growth. (Kelly Dep. 162:1–

---

[5] The date of Kelly's investment in Level Beauty is not clear on the record before the Court, but his Stock Certificate in the relevant shares is dated 17 January 2017. (ECF No. 148.32.)

[6] Level Beauty later became YCBD, also referred to as cbdMD, which is now a publicly traded company. (Kelly Dep. 63:10–63:16, 67:22–67:24.) Although the name of the company has changed, the Court refers to it as Level Beauty for purposes of this Order and Opinion.

162:11.) Kelly also spoke with Siskey, but Kelly did not recall when that meeting was or what Siskey said to influence his decision to invest in Kure. (Kelly Dep. 161:13–161:24.)

### v. Sharon Road Properties

33. Kelly invested $100,000 in Sharon Road Properties on 22 June 2016. (Kelly Dep. 250:4–250:17, 256:13–256:22.) At the time he invested, Kelly thought he was purchasing an interest in a building he believed Siskey owned at 4521 Sharon Road in Charlotte, North Carolina, but Kelly was not sure what percentage of the building he was purchasing. (Kelly Dep. 250:18–251:21.) Kelly spoke with Phillips, but not with Siskey, prior to investing. (Kelly Dep. 251:22–252:3.) According to Kelly, Phillips informed Kelly that the investment would return eight percent—four percent in cash that Kelly would receive later, and four percent in equity. Phillip also told Kelly he had the ability to cash out at any time. (Kelly Dep. 255:5–255:18.)

34. Kelly neither reviewed financial statements or appraisals valuing the building, nor did he review any leases or rent rolls regarding the building's occupancy prior to investing. (Kelly Dep. 253:23–254:10.)

### E. Siskey's Disciplinary History and MetLife's Response

35. In 2000, after working for MetLife for six months, Siskey was disciplined for forging his wife's signature on an annual NASD compliance meeting roster. (Bundy Dep. Exs. Ex. 1009.) In a letter to Siskey from Leonard Bakal, MetLife's Vice President and Compliance Director at the time, Siskey was informed that "Company policy prohibits, under any circumstances, any individual from signing another

individual's name to an attendance roster for any compliance meeting . . . or any similar meeting . . . or Company document." (Bundy Dep. Exs. Ex. 1009.) Siskey was also disciplined in that letter for reporting annuity sales as unsolicited when they were in fact solicited, which was against Company compliance rules because it constituted an incorrect completion of client documents. (Bundy Dep. Exs. Ex. 1009.) Bakal warned Siskey that "any future violations of federal securities laws, NASD rules or Company compliance procedures may subject [Siskey] to appropriate disciplinary action by [MetLife] and/or [the] NASD" and could result in penalties deemed appropriate, "up to and including termination." (Bundy Dep. Exs. Ex. 1009.)

36. On or about March 2002, MetLife learned Siskey misrepresented in filings with MetLife the true nature and extent of his involvement with the Premier Fund, LLC and Premier II, LLC. (MetLife's Objs. Resps. Pls' First Set Interrog. 27, ECF No. 186.8 ["MetLife's Resp. First Interrog."].) As a result of Siskey's failure to properly disclose his participation in outside business activities ("OBAs"), MetLife issued a formal letter of censure and caution, ordering Siskey to wind-up the business of both entities. (MetLife's Resp. First Interrog. 27.)

37. Siskey was again disciplined in 2004 for improperly disclosing his OBAs, (*see supra*, ¶¶ 10–12), resulting in Siskey consenting to a suspension of his NASD license and being placed on a Supervision Plan with MetLife on 19 April 2004, (ECF Nos. 148.10, 148.11; Bundy Dep. Exs. Ex. 979).

38. The Supervision Plan for Richard Siskey (the "Supervision Plan") provided that Gordon Silva ("Silva"), MetLife's General Securities Principal, would directly

supervise Siskey, as he was "located in the same office" as Siskey. (Bundy Dep. Exs. Ex. 979.) Among other things, the Supervision Plan required Silva to: create and maintain a supervision file for Siskey; review and approve all new business applications submitted by Siskey; hold and document meetings with Siskey to "review his current marketing activity, prospecting, anticipated new business submissions and any pending new business under management review"; review with Siskey his OBA disclosures on a quarterly basis; and, notify the Compliance Director, Mr. Bakal, of any customer or regulatory complaints involving Siskey that were received by the agency. (Bundy Dep. Exs. Ex. 979.)

39.     The Supervision Plan was to remain in effect until otherwise modified or terminated by the MetLife compliance department. (Bundy Dep. Exs. Ex. 979.) There is no evidence before the Court to suggest the Supervision Plan was ever modified or terminated.

40.     In 2006, the MetLife compliance department investigated a complaint alleging "unethical practices by Gordon Silva and Ric[k] Siskey" at the Wall Street Capitol office. (Bundy Dep. Exs. Ex. 982.) MetLife's investigation, beginning in June 2006 and lasting until November 2006, concluded that the allegations were without merit because they could not be substantiated. (Bundy Dep. Exs. Ex. 979.)

41.     Siskey was investigated by MetLife again from December 2008 through April 2009 after he submitted an updated OBA report that raised concerns. (Bundy Dep. Exs. Ex. 985.) No formal discipline resulted from this investigation, but Siskey

was required to resubmit corrected OBA reports for the years 2008 and 2009. (Bundy Dep. Exs. Ex. 985.)

42. On 1 March 2011, Siskey, Wall Street Capitol, LLC, and the U.S. Department of Labor (the "Department") entered a Stipulation of Settlement (the "Settlement") following an investigation into whether Siskey and/or Wall Street Capitol violated Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"). (Bundy Dep. Exs. Ex. 999.) Under the Settlement, Siskey and Wall Street Capitol agreed to make several payments to entities and individuals in connection with investments made in the Premier Fund, LLC and in Sharon Road Properties. (Bundy Dep. Exs. Ex. 999.) In exchange, the Department agreed not to initiate any action against Siskey and Wall Street Capitol in Federal District Court. (Bundy Dep. Exs. Ex. 999.)

43. In 2015, MetLife began investigating the life insurance policies Siskey purchased on the lives of his individual business clients. (*See* Bundy Dep. Exs. Ex. 1003, 1005.) As early as 9 November 2015, MetLife's Senior Fraud Investigator Anthony Bundy ("Bundy") interviewed the individuals whose lives were insured by the policies Siskey held. (Bundy Dep. Exs. Ex. 1003.) The 19 February 2016 Internal Investigation Report that followed indicated that Siskey resigned his broker appointment with the Company in November 2015 prior to being interviewed for the investigation. (Bundy Dep. Exs. Ex. 1005.)

44. Bundy recalled that he spoke with another MetLife investigator around November 2015 and that investigator believed it "sounded like [Siskey's actions were

similar to] . . . the fact pattern of what [they] have seen in the past related to a Ponzi scheme." (Bundy Dep. 100:2–100:20.) When asked whether anyone else at MetLife had taken any action to investigate whether Siskey was operating a Ponzi scheme, Bundy responded:

> [a]ll we had was a single comment by a customer that said if he had been, you know, reimbursed for his own losses, that's all we had. What [the other investigator] said to somebody else, I don't know, but what we didn't have is enough to say that there was anything occurring. This was no more than a hunch, at best.

(Bundy Dep. 101:4–101:21.)

45. According to MetLife's expert, "absent a customer complaint, it is generally very difficult for insurance companies to discover insurance violations or misconduct." (Goodwin Expert Report ¶ 56, ECF No. 148.7 ["Goodwin Report"].) Goodwin opined that "MetLife conducted itself with appropriate due diligence regarding the matters identified by [its security software,] and its subsequent investigation [of Siskey] in 2015 and 2016." (Goodwin Report ¶ 67.) Goodwin further opined that MetLife "had no obligation (or even the practical ability) to report the results of the investigation [into Siskey] to Mr. Kelly" given that Kelly was not a MetLife customer, held no MetLife policy or account, and did not otherwise have a relationship with MetLife. (Goodwin Report ¶ 75.)

46. According to Phillips, Kelly never asked him about Siskey's legal history or any history Siskey had with regulators. (Phillips Aff. ¶ 26.)

## III.    PROCEDURAL HISTORY

47.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

48.    On 3 May 2018, Kelly initiated this action by filing his Complaint alleging claims against MLIC, MSI Financial, and Phillips.[7]   (*See* ECF No. 4.)   The First Amended Complaint ("Amended Complaint") was filed on 26 September 2018.   (Am. Compl.)

49.    Kelly included 9 purported claims for relief in the Amended Complaint: (1) fraud; (2) constructive fraud; (3) violations of the North Carolina Securities Act ("NCSA"); (4) negligent misrepresentation; (5) professional negligence; (6) negligence; (7) unfair and deceptive trade practices (UDTP) pursuant to N.C.G.S. § 75-16; (8) vicarious liability; and (9) punitive damages.   (*See* Am. Compl.)

50.    The Court disposed of several of these claims in *Aldridge v. Metro. Life Ins. Co. ("Aldridge I")*, holding that Kelly lacked standing under Rule 12(b)(1) to assert the claims directly against MetLife for "fraud, constructive fraud, and negligent misrepresentation" based on Kelly's investments in TSI Holdings and Sharon Road Properties.   *Aldridge I*, 2019 NCBC 49, ¶ 7, 134D (N.C. Super. Ct. Aug. 15, 2019).

51.    The Court disposed of several additional claims in *Aldridge v. Metro. Life Ins. Co. ("Aldridge II")* under Rule 12(b)(6).   *See Aldridge II*, 2019 NCBC 81 (N.C.

---

[7] Kelly was originally joined by four other plaintiffs who are no longer parties to this action. Two plaintiffs voluntarily dismissed their claims with prejudice in October 2020, and the remaining two dismissed their claims with prejudice in January 2021.  (ECF Nos. 121, 135–36.)  There was also a fourth defendant in this matter, and all claims against that defendant were dismissed without prejudice on 31 October 2018.  (ECF No. 54.)

Super. Ct. Dec. 31, 2019). The following claims against MetLife were dismissed: (1) fraud by affirmative misrepresentation based on *respondeat superior*; (2) constructive fraud; (3) negligent misrepresentation under a direct theory of liability; (4) claims arising under the NCSA; (5) negligent supervision related to Phillips; (6) the UDTP claims; and (7) the standalone claim for punitive damages. *Id.* at ¶ 246(D). The Court also dismissed Kelly's claims against Phillips for fraud, constructive fraud, and securities fraud under the NCSA. *Id.*

52. The Motion was filed on 22 December 2021. Following full briefing, the Court held the Hearing at which all parties to the Motion were present and represented by counsel.

53. After the Hearing, counsel for Kelly was permitted to file a correction to the record to remedy a mistake in the filing of his response to the Motion. (ECF Nos. 190, 192.) In addition, pursuant to the Court's Order, Plaintiff was permitted to file Exhibit 11 to Kelly's Deposition. (*See* ECF No. 193.)

54. The Motion is now ripe for resolution.

## IV. LEGAL STANDARD

55. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000).

56.     The moving party bears the burden of showing that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008).  The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83 (citations omitted).

57.     "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).

58.     The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83.  However, the nonmovant

> may not rest upon the mere allegations or denials of their pleading, but their response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant].

N.C.G.S. § 1A-1, Rule 56(e).

## V.     ANALYSIS

59.     Four of Kelly's claims remain against MetLife: (1) direct liability for fraud by omission or concealment as to Kelly's investments in Stone Street and Level

Beauty;[8] (2) negligent supervision of Siskey as to the Stone Street and Level Beauty investments;[9] (3) negligent misrepresentation under a theory of *respondeat superior* based on Siskey and Phillips's alleged negligent misrepresentations; and (4) vicarious liability under a theory of *respondeat superior* based on Phillips' professional negligence.

## A.    Direct Liability for Fraud by Omission or Concealment

60.    "Where a fraud claim arises by concealment or nondisclosure of material facts, a plaintiff must allege that the defendant(s) 'had a duty to disclose material information to [the plaintiff], as silence is fraudulent only when there is a duty to speak.'" *Aldridge II*, 2019 NCBC 81, ¶ 172 (citing *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC 20, ¶ 34 (N.C. Super. Ct. June 18, 2007)).

61.    Fraud claims based on omission(s) require a plaintiff to allege:

(1) the relationship between plaintiff and defendant giving rise to the duty to speak; (2) the event that triggered the duty to speak or the general time period over which the relationship arose and the fraud

[8] The Amended Complaint alleges this claim as to MetLife, contending that Kelly "suffered actual harm as a result of misrepresentations and concealment of material facts by JD Phillips [and MetLife] in the form of the loss of [his] investments in the Ponzi Entities and other fraudulent entities." (Am. Compl. ¶ 259.) The term "Ponzi Entities" was defined as including: WSC Holdings, LLC, SouthPark Partners, LLC, Siskey Industries, LLC, Sharon Road Properties, LLC, and TSI Holdings, LLC. (Am. Compl. ¶ 60.) As stated herein, the claims as to Sharon Road Properties and TSI Holdings have been dismissed. No "other fraudulent entities" are defined in the Amended Complaint. There is no reference in the Amended Complaint to Kure which would cause the Court to include it in the analysis of this claim, and no party argues that Kelly's investment in Kure was the result of fraud by omission or concealment on the part of MetLife; thus, the Court does not address the Kure investment as to this claim.

[9] In *Aldridge I,* the court determined that Kelly lacked standing to assert claims for negligent supervision with respect to the investments in Sharon Road Properties and TSI Holdings. *Aldridge I*, 2019 NCBC 49, at ¶ 125–27. As stated in the preceding footnote, because no party argues that this claim applies to the Kure investment, the Court does not address the Kure investment as to this claim.

occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what the defendant gained from withholding the information; (6) why the plaintiff's reliance on the omission was reasonable and detrimental; and (7) the damages the fraud caused the plaintiff.

*Lee v. McDowell*, 2020 NCBC 74, ¶ 40 (N.C. Super. Ct. Oct. 14, 2020) (citing *Island Beyond, LLC v. Prime Cap. Grp., LLC*, 2013 NCBC 51, *18 (N.C. Super. Ct. Oct. 30, 2013)) (internal marks omitted).

62. A duty to disclose arises in three situations:

(1) there is a fiduciary relationship between the parties to the transaction; (2) a party has taken affirmative steps to conceal material facts from the other; or (3) one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence.

*Aldridge II*, 2019 NCBC 81, at ¶ 173 (internal marks omitted). Even in the absence of a duty to speak, "it is well-established that once a party chooses to speak, that party then 'has a duty to make a full and fair disclosure of facts concerning the matters on which he chooses to speak.'" *Id.* (citing *Ragsdale v. Kennedy*, 286 N.C. 130, 139 (1974)).

63. MetLife contends that Kelly has failed to forecast evidence establishing that it concealed Siskey's disciplinary history from him. (Defs.' Br. Supp. Mot. Summ. J. 15, ECF No. 152 ["Br. Supp. Mot."].) MetLife argues that the undisputed facts show that Kelly was not a MetLife customer, MetLife was unaware of Kelly, and MetLife did not know that he was relying on its alleged silence. Therefore, MetLife contends, it owed him no legal duty. (Br. Supp. Mot. 16.)

64. Further, MetLife argues that, even if a duty to speak existed, the undisputed facts indicate that Kelly was alerted to Siskey's disciplinary history by Stone Street's disclosures but failed to conduct minimal due diligence. (Br. Supp. Mot. 16; *see* ECF 148.18.) Accordingly, even if the Stone Street disclosure was not enough to alert Kelly to Siskey's disciplinary history, MetLife's position is that Kelly's reliance is not reasonable because he failed to make any independent investigation or demonstrate that he was prevented from doing so. (Br. Supp. Mot. 17.)

65. Kelly argues that he has established that "MetLife had actual knowledge of the Ponzi scheme in 2015 when [Kelly] invested with Siskey and Phillips at MetLife's Wall Street Capitol Office." (Pl.'s Resp. Opp. Defs.' Mot. Summ. J. 7, ECF No. 160 ["Pl.'s Br. Opp."].) Kelly relies on deposition testimony from Bundy, as well as evidence that Siskey was placed under the Supervision Plan by MetLife. (Pl.'s Br. Opp. 7–8.) Kelly argues that it is "untenable" for MetLife to argue that it had no knowledge of the fraud perpetrated upon him. (Pl.'s Br. Opp. 8.)

66. Kelly further contends that this Court can "presume" reliance if an alleged omission is material. (Pl.'s Br. Opp. 8.) He further contends that a question of fact remains as to whether "in 2015 and 2016 MetLife knew whether Rick Siskey[,] a criminal[,] was defrauding Wall Street Capitol customers who thought they were investing with MetLife." (Pl.'s Br. Opp. 8.) However, in making this argument, Plaintiff fails to cite to evidence in the record to support his claim.

### i. MetLife had no duty to speak

67. Here, the evidence is uncontroverted that MetLife did not have a fiduciary relationship with Kelly, did not take affirmative steps to conceal material facts from Kelly, and did not have "knowledge of a latent defect in the subject matter of the negotiations about which the other party [was] both ignorant and unable to discover through reasonable diligence." *Aldridge II*, 2019 NCBC 81, at ¶ 173. Consequently, MetLife had no duty to speak.

68. A fiduciary relationship is generally described as arising when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dalton v. Camp*, 353 N.C. 647, 651 (2001). "Fiduciary relationships are readily apparent, for example, in the relationship of spouses, attorney and client, and trustee and beneficiary[.]" *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014) (internal citations omitted). MetLife did not know who Kelly was, or that Kelly had a financial relationship with Siskey. Similarly, Kelly never received any documents or communication from MetLife to indicate that his investment in Stone Street and Level Beauty were MetLife products. In short, the undisputed facts do not give rise to a fiduciary relationship between Kelly and MetLife.

69. Similarly, given that MetLife was unaware of Kelly, it could not have taken affirmative steps to conceal material facts about Level Beauty or Stone Street from Kelly, even if it knew such information.

70.     Further, there is no evidence in the record establishing that MetLife knew of a defect concerning Kelly's investments in Stone Street and Level Beauty that Kelly could not have discovered through reasonable diligence.  Even if MetLife was aware of Siskey's disciplinary history and suspicious of his outside business transactions prior to its investigation of him in November 2015, MetLife had no duty to speak to a non-client who was considering non-MetLife investments in July 2015.  Kelly's belief that his investments in Stone Street and Level Beauty were MetLife products, by itself, does not give rise to a duty on MetLife's part to speak.

### ii.     Kelly cannot show reasonable reliance

71.     Even if there were a duty to speak on the part of MetLife, fraud by omission requires that the plaintiff's reliance on the omission be both "reasonable and detrimental."  *See Lee*, 2020 NCBC 74, at ¶ 40.  Reasonable reliance must be shown to make a case for actionable fraud.  *See Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568–71 (1988).

72.     Assuming Kelly were able to show reliance on an omission by MetLife—and he has not on the record before the Court—his reliance must be reasonable.  "Reliance is not reasonable when the party 'could have discovered the truth of the matter through reasonable diligence, but failed to investigate.' " *Brewer v. Grue*, 2020 NCBC 59, ¶ 11 (N.C. Super. Ct. Aug. 28, 2020) (citing *Sullivan*, 158 N.C. App. at 26).

73.     When investing in Stone Street, Kelly received an investment packet containing information about the entity and its Management.  (*See* Stone St. Inv. Packet.)  Siskey is listed as one of the principals of the Company, accompanied by a

disclosure that he "has been the subject of various legal and administrative proceedings, none of which are (sic) considered to be material to the operation of the Company. Further information about any of these matters will be provided upon request." (Stone St. Inv. Packet 22.)

74. The same notice is not included in the TSI Holdings investment packet. (*See* TSI Holdings Investment Packet at Kelly 438, ECF No. 148.19.)

75. Kelly's $200,000 investment in Stone Street was one of his first in the Siskey-related entities and occurred on 23 June 2015. He was given information that Siskey was involved in "legal and administrative proceedings." If those matters were material to Kelly's decision to invest in Stone Street, Kelly could have, and should have, inquired further to obtain information about Siskey's past. Instead, Kelly failed to make any further investigation. Having so decided, Kelly cannot now argue that he reasonably relied on any alleged omission by MetLife.

76. Defendants have shown that, on the record before the Court, there are no remaining genuine issues of material fact to be decided and they are entitled judgment with respect to this claim as a matter of law. Accordingly, Kelly's claim for fraud by omission or concealment is DISMISSED.

**B.** **Direct Liability for Negligent Supervision of Rick Siskey**

77. Our Supreme Court has held that "[n]o legal duty exists [for negligence by an employer to a third party] unless the injury to the plaintiff was foreseeable and avoidable through due care." *Stein v. Asheville City Bd. Of Educ.,* 360 N.C. 321, 328 (2006).

78.     More recently, in *Keith v. Health-Pro Home Care Servs.*, our Supreme Court reaffirmed that an employer may, in certain circumstances, be liable to third-persons as a result of the negligence or intentionally wrongful conduct of an employee or independent contractor.  *See* 381 N.C. 442 (2022).  Relying on *Medlin v. Bass* and *Little v. Omega Meats I, Inc.*, the Court declared that:

> when a plaintiff alleges an employer negligently hired, retained, or supervised an employee, and seeks recovery from the employer for injury caused by the employee, the *Medlin* elements for negligent hiring and the *Little* nexus requirement for duty must be satisfied to show a negligence claim in this context. . . . Therefore, to survive a motion for directed verdict or judgment notwithstanding the verdict for their negligence claims, the Keiths had to present evidence to support each element set forth in *Medlin* and to support a nexus between the employment and the injury as required by *Little*.

*Id.* at 462–63 (citing *Medlin v. Bass*, 327 N.C. 587 (1990); *Little v. Omega Meats I, Inc.*, 171 N.C. App. 583 (2005)).

79.     The *Medlin* Court held that to succeed on a claim for negligent supervision, a Plaintiff must prove:

> (1) The specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' . . .; and (4) that the injury complained of resulted from the incompetency proved.

*Medlin*, 327 N.C. at 591; *Keith*, 381 N.C. at 451.

80.     In addition, Plaintiff must satisfy the *Little* "nexus proof requirement," meaning that there must be a sufficient nexus between the employment relationship of the employer and the tortfeasor, on the one hand, and the injury alleged to have

been visited on the plaintiff, on the other hand, to provide proof that the injury for which compensation is sought was reasonably foreseeable by the defendant-employer.

81. In *Little*, the Court of Appeals listed three factors to be considered by the trial court when determining if there is such a nexus: (1) whether plaintiff and the tortfeasor employee/independent contractor were both in places where each had a right to be when the wrongful act occurred; (2) whether the plaintiff met the employee/independent contractor as a direct result of the employment; and (3) whether the employer received some benefit, even if only potential or indirect, from the meeting of the employee and the plaintiff. *Little*, 171 N.C. App. at 587–88; *Keith*, 381 N.C. at 452.

82. However, a plaintiff need not prove all three factors. In *Keith*, the Supreme Court determined that the Court of Appeals in the case before it had "erred by reading *Little* to have 'identified three specific elements that must be proven,' and by declining 'to hold employers liable for the acts of their employees under the doctrine of negligent hiring or retention when any of [the] three factors was not proven.'" *Keith*, 381 N.C. at 454.

83. This Court interprets the Supreme Court's discussion of the *Little* factors in *Keith* to mean that although trial courts should *consider* all three *Little* factors in determining whether a sufficient nexus exists, plaintiffs are not required to prove all three elements in every case. Rather, the Court interprets the Supreme Court's

directive to mean only that it must consider the three factors flexibly when determining whether there is evidence to prove reasonable foreseeability.[10]

84.    Adjudged by this standard, the Court concludes that Kelly has failed to come forward with sufficient evidence to create a jury issue with respect to the *Little* nexus requirement.  Simply put, the relationship between Kelly, as customer, on the one hand, and Siskey, as broker, on the other hand, had nothing to do with the MetLife Defendants.

85.    It is true that a number of acts by Siskey during his time as an employee of, and then independent contractor for, MLIC demonstrated his incompetency and provided MetLife with notice that he was unfit, including: (1) Siskey's discipline for forging his wife's signature in 2000, (2) Siskey's misrepresentation of his involvement with the Premier Fund, LLC and Premier II, LLC in 2002, (3) the NASD license suspension in 2004 as a result of improperly reporting OBAs, (4) the OBAs report and investigation in 2008, (5) Siskey's settlement with the Department of Labor in 2011, and (6) Siskey holding life insurance policies on the lives of his business clients and paying the premiums on those policies.

86.    However, even if Kelly could forecast evidence to satisfy *Medlin*, he is unable to meet the *Little* nexus requirement and, without it, he cannot establish foreseeability.  Of the three factors discussed in Little, only one is present here: Kelly and Siskey were each presumably in places where they individually had a right to be

---

[10] The Court also interprets the Supreme Court's decision in *Keith* to stand for the proposition that it is irrelevant whether the third-party tortfeasor is an employee of the defendant or an independent contractor.

when the negligent supervision of Siskey by MetLife allegedly occurred. Kelly cannot, however, show that (1) he met Siskey as a direct result of his employment with MetLife, or that (2) MetLife received some benefit, even if only potential or indirect, from Siskey's interactions with Kelly.

87. First, Kelly did not meet Siskey as a result of his employment with MetLife. The evidence in the record demonstrates that Kelly first met with Phillips, not Siskey, in June 2015 to discuss the relevant investments. Phillips and Kelly did not discuss MetLife products. Further, Kelly invested in Stone Street (and potentially Level Beauty) before visiting the Wall Street Capitol office in Charlotte, meaning that Kelly cannot rely on that being an office of MetLife to argue that there was a causal connection.

88. Further, MetLife received no benefit from the meeting of Siskey and Kelly. While MetLife received a portion of the funds from Siskey selling insurance for MLIC as an independent contractor, Siskey never sold any such policy, or any other MetLife product for that matter, to Kelly. Further, Stone Street and Level Beauty were not publicly traded securities, and they were not sold by MetLife. This is further evidenced by the fact that MetLife has no records of Kelly or of a relationship between Kelly and Siskey.

89. Even though one of the three *Little* factors is met, it does not lead logically to a conclusion that MetLife should have foreseen the harm alleged here. Thus, the Court finds that Kelly has not presented evidence to establish a *prima facie* case of negligent supervision, and Kelly's claim for negligent supervision is DISMISSED.

## C.    **Vicarious Liability Claims**

90.    Kelly's two remaining claims each seek to hold MetLife vicariously liable under *respondeat superior* for (1) negligent misrepresentations made by Siskey and Phillips in investment or account statements, and (2) Phillips' professional negligence.

91.    As a preliminary matter, both negligence claims fail because the record evidence before the Court is that, at least since 2013, Siskey and Phillips were independent contractors for MetLife.

92.    The doctrine of *respondeat superior* generally allows an employer to be held vicariously liable for tortious acts committed by an employee acting within the scope of his employment.  *Creel v. N.C. HHS*, 152 N.C. App. 200, 203 (2002).  "Fundamental to the application of the doctrine of *respondeat superior* is the requirement that there be an employer-employee relationship between the parties."  *Id.*  "[A]n employer may be held vicariously liable under the doctrine of *respondeat superior* for a tortious act committed by an 'employee' but not [those] committed by an 'independent contractor.'"  *Creel*, 152 N.C. App. at 204 (citing *Vaughn v. Dept. of Human Resources*, 296 N.C. 683, 686 (1979)).

93.    An employer's "vicarious liability for the torts of his agent depends on the degree of control retained by the principal over the details of the work as it is being performed.  The controlling principle is that vicarious liability arises from the right of supervision and control."  *Vaughn*, 296 N.C. at 686.  When the employer retains the right to control and direct the "manner in which the details of the work are to be

executed and what the [worker] shall do as the work progresses" there is an employer-employee relationship. *Hayes v. Board of Trustees*, 224 N.C. 11, 15 (1944). However, when a worker "contracts to do a piece of work according to his own judgment and methods, and without being subject to his employer except as to the result of the work," that person is an independent contractor. *Id.*

94. On 4 April 2011, Siskey executed the MetLife Unified Brokerage Associate Agreement (the "UBA Agreement"). (Bundy Dep. Exs. Ex. 1000.) The first page of the UBA Agreement provides that Siskey is "an independent contractor and not an employee of MetLife or its subsidiaries or affiliates. None of the terms of this Agreement shall be construed as creating an employer-employee relationship[.]" (Bundy Dep. Exs. Ex. 1000, 1.) While MetLife retained the authority to select and price the insurance policies Siskey was permitted to sell, MetLife's UBA Agreement otherwise permitted Siskey to solicit and sell insurance policies according to his own judgment and methods. (Bundy Dep. Exs. Ex. 1000, 2.)

95. Siskey also executed the MetLife Affiliated Broker Contract on 30 December 2013. (Bundy Dep. Exs. Ex. 1022, 7.) The Affiliated Broker Contract further bolsters the Court's conclusion that Siskey was an independent contractor, as Siskey was permitted to "determine the time, place and manner for solicitation of applications for Products" and was responsible for "maintaining and operating his . . . own offices" as he saw fit. (Bundy Dep. Exs. Ex. 1022, 1.) Siskey was not required to work a set number of hours, or on any particular days. (Bundy Dep. Exs. Ex. 1022, 1.) Thus, even if under the 2011 UBA Agreement Siskey was not an independent

contractor, he certainly was under the 2013 Affiliated Broker Contract. Thus, Siskey was an independent contractor with MetLife at all relevant times that he interacted with Kelly, and MetLife cannot be responsible for Siskey's allegedly negligent misrepresentations.

96. All record evidence before the Court demonstrates that Phillips was also an independent contractor for MetLife. On 30 December 2013, Phillips became an independent contractor permitted to sell authorized MetLife products. (Phillips Aff. ¶¶ 2–3.) Phillips understood that he was permitted to sell products authorized by MetLife, but that he was otherwise free to determine the time, place, and manner of his work. (*See* Phillips Aff. ¶ 3.) Phillips terminated his relationship with MetLife on 31 October 2015 but retained authority to service his pre-existing accounts. (Phillips Aff. ¶ 4.) Thus, Phillips was an independent contractor with MetLife at all relevant times that he interacted with Kelly, and MetLife cannot be responsible for Phillips' allegedly negligent misrepresentations or professional negligence.

97. Therefore, MetLife cannot be held vicariously liable under the doctrine of *respondeat superior* because Siskey and Phillips were both independent contractors at the time any alleged negligence occurred in relation to their communication and business with Kelly.

98. Even assuming, *arguendo*, that Siskey and Phillips were not independent contractors, the remaining two claims also fail on other bases.

### i. Negligent Misrepresentation on a Theory of *Respondeat Superior*

99. This Court determined in *Aldridge I* that Kelly lacked standing to assert a direct claim for negligent misrepresentation against the MetLife Defendants. *Aldridge I*, 2019 NCBC 49, at ¶¶ 121–22. The only remaining claim is one for vicarious liability on a theory of *respondeat superior* for the actions of Siskey and Phillips, specifically that Siskey and Phillips sent Kelly "fraudulent investment statements regarding Kelly's Wall Street Capitol investments." *Aldridge II*, 2019 NCBC 81, at ¶ 193.

100. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 369 (2014). Under well-settled North Carolina law,

> a breach of duty giving rise to a claim for negligent misrepresentation has been defined as: "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Aldridge II*, 2019 NCBC 81, at ¶ 188 (quoting *Simms*, 140 N.C. App. at 534). "The requirement of justifiable reliance is derived from Restatement § 552(1), providing 'liability for pecuniary loss caused to [the plaintiff] by their justifiable reliance upon the information.'" *Brinkman v. Barrett Kays & Assocs., P.A.*, 155 N.C. App. 738, 742 (2003) (alteration in original) (quoting *Raritan River Steel Co. v. Cherry, Bekaert &*

*Holland*, 322 N.C. 200, 206 (1988), *rev'd on other grou*nds, 329 N.C. 646 (1991)). Justifiable reliance is analogous to reasonable reliance in fraud actions. *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 224 (1999). "Reliance is not reasonable if a plaintiff fails to make any independent investigation, or fails to demonstrate he was prevented from doing so." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 449 (2015) (internal marks and citations omitted). "Whether a party's reliance is justified is generally a question for the jury, except in instances in which the facts are so clear as to permit only one conclusion." *Dallaire*, 367 N.C. at 369 (internal marks omitted).

101.     First, MetLife owed Kelly no duty. As stated herein at Paragraphs 67–70 Plaintiff points to no evidence in the record that supports a finding that MetLife knew Kelly, or that it knew anything about the investments he made between June 2015 and June 2016. As stated herein, MetLife had no duty to speak to a non-client it did not know who was considering non-MetLife investments through an independent contractor to the company.

102.     Further, Kelly cannot demonstrate reasonable reliance because he failed either to make an independent investigation or demonstrate that he was prevented from doing so. *See Arnesen*, 368 N.C. at 449; *Martin Communs., LLC v. Flowers*, 2021 NCBC 21, ¶¶ 40–44 (N.C. Super. Ct. Mar. 31, 2021) (dismissing plaintiff's negligent misrepresentation claim pursuant to Rule 12(b)(6) because there were no allegations that plaintiff attempted to investigate the veracity of defendants' statements or obtain access to information held by defendants). While uncovering

misrepresentations in investment statements is no doubt difficult, there is no indication that Kelly tried. There is nothing to suggest that he made pertinent inquiries or sought outside advice about his investments. In fact, the evidence indicates that Kelly did not consult with an accountant or any other kind of advisor prior to or after investing, even though he did have an accountant. (Kelly Dep. 192:23–193:3.)

103. To the extent that Kelly believed his investments were related to or held by MetLife, there is no evidence that Kelly ever called, emailed, or otherwise communicated with MetLife to confirm this assumption, and there is nothing in the account statements or other paperwork he received indicating any affiliation between his investments and MetLife. Kelly also did not communicate with MetLife about the balance of his investments, or request to speak with another financial advisor about the funds in his investment accounts. Because Kelly puts forth no evidence that he made inquiry or was prevented from doing so, he has failed to demonstrate the justified reliance necessary to support a negligent misrepresentation claim. *See Dallaire*, 367 N.C. at 370.

104. Under these circumstances, Kelly's claim for negligent misrepresentation is DISMISSED.

### ii. Professional Negligence on a Theory of *Respondeat Superior* as to Phillips

105. "A claim of professional negligence requires evidence that the defendant had a duty to conform to a certain standard of care . . . and that a breach of that duty proximately caused injury." *Potts v. KEL, LLC*, 2019 NCBC 60, ¶ 13 (N.C. Super. Ct.

Sept. 27, 2019). Our courts have consistently held that a duty arises where one person, in the course of their business or profession, provides investment advice to another with the knowledge that their advice will be relied upon. *See Howell v. Fisher*, 49 N.C. App. 488, 494–96 (1980).

106. "A claimant is required to establish the standard of care for a professional negligence claim through expert testimony 'where the common knowledge and experience of the jury is [not] sufficient to evaluate compliance with a standard of care[.]'" *Comput. Design & Integration, LLC v. Brown,* 2018 NCBC 128, ¶ 153 (N.C. Super. Ct. Dec. 10, 2018) (quoting *Frankenmuth Ins. v. City of Hickory*, 235 N.C. App. 31, 35 (2014)) (internal marks omitted). Determining whether a party failed to provide accurate financial statements and failed to maintain proper books and records requires expert testimony. *Id.* at ¶ 158. "Without evidence of the applicable standard of care, [the] plaintiff has failed to establish a *prima facie* claim for professional negligence." *Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, 2019 NCBC 46, ¶ 222 (N.C. Super. Ct. Aug. 8, 2019) (internal marks omitted).

107. Here, Kelly argues that he does not need an expert to explain "that a MetLife financial representative should not suggest he invest in an entity like TSI Holdings, LLC which conducted no business and served no function whatsoever other than Rick Siskey's massive Ponzi scheme." (Pl.'s Br. Opp. 11.) Kelly does not cite to any case law or evidence in the record to support that argument.

108. MetLife argues that Kelly lacks the expert testimony necessary to establish the professional negligence claim because none of Kelly's experts offers an opinion

about Phillips or the standard of care that applied to him. (Br. Supp. Mot. 28–29.) Without evidence of the applicable standard of care, MetLife argues that Kelly cannot establish a *prima facie* claim for professional negligence. (Br. Supp. Mot. 29.)

109. The Court agrees with MetLife. Kelly's expert Sander Ressler ("Ressler") opined only on matters concerning Siskey's actions and the alleged failure by MetLife to supervise him appropriately. (*See* ECF No. 186.7.) Kelly indicated the existence of a second expert report from Robert Lawson dated 1 June 2021, (*see* ECF No. 186), but Plaintiff did not submit that report for the Court's review, and it does not otherwise appear as a part of the record before the Court.

110. Without an expert to provide evidence of the applicable standard of care, Plaintiff's claim for professional negligence must fail. Accordingly, the claim for professional negligence is DISMISSED.

## IV. CONCLUSION

111. For the foregoing reasons, the Court hereby **GRANTS** the Motion. Each of Plaintiff's remaining claims is hereby **DISMISSED** with prejudice.

**SO ORDERED**, this the 14th day of November, 2022.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
   for Complex Business Cases